**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CASE NO.: 8:25-cv-00804-KKM-AEP**

TREVOR JARED SMITH,

    Plaintiff,

       v.

ROBERT J. PERRAULT, JR. and
the FLORIDA DEPARTMENT OF
FINANCIAL SERVICES,

    Defendants.

_____/

**AMENDED COMPLAINT**

Plaintiff, Trevor Jared Smith ("Smith"), by his undersigned counsel, sues

Defendants, Robert J. Perrault, Jr. ("Perrault") and the Florida Department of

Financial Services ("DFS"), and alleges:

**INTRODUCTION**

1.  This is a case involving a coordinated and calculated effort by

Perrault – a detective in the Bureau of Insurance Fraud for the Florida Department of

Financial Services, Criminal Investigations Division – to substantially cause Smith to

be criminally prosecuted ***in three separate felony cases*** for:

> (a)    fraudulently presenting an insurance claim valued in excess of $100,000;
>
> (b)    acting and impersonating a public adjuster without a license;

(c)    unlawful acts while in the capacity of a contractor during a state of emergency;

(d)    fraudulent use of personal identification information;

(e)    uttering a forged instrument; and

(f)    unlicensed contracting during a state of emergency.

Smith, then 27 years old, was an independent contractor for a roofing company, whose professional responsibilities substantially involved sales, as well as assisting a roofing company with signing up potential customers that suffered hurricane damage to their roofs. These customers all had property damage coverage under their homeowners' insurance policies with various insurers authorized to do business in the State of Florida.

2.    Nevertheless, Perrault believed Smith's sales activities were criminal in nature, and, on behalf of DFS, persuaded the Office of the State Attorney for the respective counties at issue to prosecute Smith for serious felony crimes. In total, Smith faced decades in prison for crimes he did not commit, that were orchestrated by Perrault on behalf of DFS, and were based on false facts.

3.    In reality, the factual bases for the felony criminal charges all stemmed from egregiously faulty investigations under the ultimate authority of DFS. These investigations were nothing more than a house of cards waiting to collapse under DFS' watch. The DFS probes involved instances where Perrault fabricated facts in

investigative reports, pressured homeowners into believing they were victims of fraud, and intentionally misled the prosecuting attorney(s) into believing Smith committed felony crimes. To be sure, the criminal cases should never have been filed.

4.      Perrault's DFS investigations deprived Smith of his liberty and financially ruined his earning capacity in the roofing industry. Perrault thus acted with an evil intent or callous or reckless indifference to federally protected rights, which can also be inferred based on the below conduct. During Perrault's utterly fallacious investigations, DFS failed to properly supervise him and was at least negligent in the Smith investigations. The underlying criminal cases discussed below were styled *State of Florida v. Trevor Jared Smith*, Case Nos. 2024CF008482 and 2024CF008483, which were pending in Hillsborough County, and Case No. 2024CF001269, which was pending in Manatee County (the "Criminal Cases").

5.      Part of the duties of DFS and Perrault are to investigate potential instances of insurance fraud and to refer such cases to the Office of the State Attorney for the applicable counties for review and prosecution. Instead of targeting individuals that are engaging in insurance fraud, Perrault caused DFS to focus significant resources on Smith to falsely accuse him of participating in an insurance fraud scheme. DFS let Perrault run amok regarding the Smith investigations, which was itself tortious.

6.      Based on the deceptive, appalling, horrendously dishonest, and false investigations conducted by Perrault, on behalf of DFS, the State of Florida filed and

3

continued to prosecute Smith for about a year across all three Criminal Cases for alleged criminal conduct that had no bases in reality.

7.    Perrault's goal was to, upon information and belief, curry favor with the insurance industry for his own professional benefit. Perrault's vendetta against Smith resulted in the dissemination of materially false information to the applicable Office of the State Attorney that DFS should have known was false and/or lacked serious merit, but nevertheless was used and resulted in Smith being prosecuted for felony crimes where the penalties were decades in prison.

8.    Eventually, the true facts were uncovered as part of the discovery process in the Criminal Cases. Recognizing the cases had zero merit and were based on highly improper investigative work by Perrault, on behalf of DFS, the State of Florida quickly filed Notices of *Nolle Prosequi* to abandon and dismiss the actions. In at least one of the Criminal Cases, the prosecuting attorney sincerely apologized to Smith for all the turmoil inflicted upon him and recognized the case should have never been filed in the first place. Indeed, all three Criminal Cases resulted in final terminations on the merits because the State learned no evidence existed to support the continued prosecution of these matters.

9.    DFS was at least negligent in its investigation and failure to properly supervise its detective. Perrault is liable to Smith for malicious prosecution. Due to Perrault's wrongful conduct, Smith incurred substantial damages.

10.    DFS can be properly added to this action at this time as six months have passed since Smith sent the Pre-Suit Notice of Claim Pursuant to Florida Statute

4

768.28 (the "Notice") to DFS in connection with this action. *See* Fla. Stat. 768.28. A true and correct copy of the Notice and the Registered Return Receipt are attached hereto as **Composite Exhibit A.**

11.    The Notice was delivered to DFS on April 11, 2025, and therefore DFS could not be joined in this action until October 13, 2025 at the earliest (the expiration of six-months after delivery).

## JURISDICTION, PARTIES, AND VENUE

12.    This Court has subject matter jurisdiction under 28 U.S.C. §1331 since this case is a civil action arising under the Constitution, laws, or treaties of the United States.

13.    Plaintiff, Smith, is an individual who resides in Pinellas County, Florida and is otherwise *sui generis*.

14.    Defendant, Perrault, is an individual who, upon information and belief, resides and is domiciled in Pasco County, Florida and is otherwise *sui generis*. Perrault's actions arose and occurred during his DFS investigations of Smith.

15.    DFS is a Florida governmental agency, whose principal location is in Tallahassee, Florida, but also conducts substantial business in the Middle District of Florida.

16.    Venue is proper in the United States District Court for the Middle District of Florida under 28 U.S.C. § 1391(b)(1)-(2), because it is where the claims accrued, where the alleged criminal prosecutions occurred, where a substantial part of the

events giving rise to the claims occurred, where Perrault resides, and where many of the witnesses also reside and/or do business.

17.    All applicable conditions precedent to the filing of this lawsuit have been performed, waived, excused, or satisfied.

18.    Smith retained the undersigned counsel to represent his interests in connection with the above-captioned case, and is obligated to pay undersigned counsel reasonable attorneys' fees and costs for services rendered.

## GENERAL ALLEGATIONS

**A.    PROPERTY LOSS DUE TO HURRICANES IS A FREQUENT OCCURRENCE IN THE STATE OF FLORIDA.**

19.    It is not a secret that property damage insurance claims are prevalent in Florida due to the occurrence of hurricanes, floods, and other storm-related events. Property owners rely on their insurance companies and the policies purchased as life preservers after problems occur, and certainly after disasters strike.

20.    In recent years, Florida experienced an increase in extreme weather events that damage residential[1] and commercial properties. Studies suggest the types of storms Florida has experienced will become "more frequent and intense."[2]

21.    Homeowners usually purchase and pay premiums for insurance that is designed to "provide[] financial protection against loss due to disasters, theft and

---

[1] The Climate Reality Project, "Climate Change and Florida: What You Need to Know" (Oct. 16, 2018), *available at* https://www.climaterealityproject.org/blog/how-climate-change-affecting-florida.

[2] Environmental Protection Agency, "Climate Change Indicators: Weather and Climate," *available at* https://www.epa.gov/climate-indicators/weather-climate.

accidents" and that "pays to repair or rebuild your home if it is damaged or destroyed by fire, hurricane, hail, lightning or other disasters listed in your policy."[3] Homeowners are advised by both insurers and by the State to purchase enough coverage to rebuild your home.[4]

22.     Home repair after a storm is a high priority.  A home may be a resident's largest lifetime investment. Damage to a home can grow worse with neglect, which affects the building's structural integrity, and permits the development and growth of dangerous, health-threatening mold, carcinogens, or spores. Such damage also increases the vulnerability of the structure to milder weather events.

23.     Storms can remove shingles from roofs, damage walls or siding, and break windows. After a home is damaged, homeowners are often advised to document the damage as soon as possible, which is especially important if a homeowner's insurance policy only covers certain types of damage.

24.     To do so, the Florida Department of Financial Services advises consumers to first "obtain[] a repair estimate from a licensed contractor" to determine if "the damage exceeds your deductible by an amount that you believe to

---

[3] Insurance Information Institute, "What is covered by standard homeowners insurance?," *available at* https://www.iii.org/article/what-covered-standard-homeowners-policy.
[4] Florida Dep't of Financial Services, "Homeowners' Insurance: A Toolkit for Consumers," at 3 (*available at* https://www.myfloridacfo.com/docs-sf/consumer-services-libraries/consumerservices-documents/understanding-coverage/consumer-guides/english---homeowners-insurance-toolkit.pdf?sfvrsn=1a17d80c_21).

be sufficient to justify filing a claim with your insurance company, [and] then do so as soon as possible."[5]

## B. HOMEOWNERS' RIGHTS AND THE USE OF ASSIGNMENT OF BENEFITS CONTRACTS ARE STATUTORILY PROTECTED RIGHTS IN FLORIDA.

25. Prior to their repeal, Assignment of Benefits ("AOB") agreements did serve a functional purpose for homeowners. In fact, the Florida Legislature believes homeowners' rights are so critical that it codified a Homeowner Claims Bill of Rights (the "Homeowner Bill of Rights) into law, which is set forth in Section 627.7142 of the Florida Statutes.

26. While the Homeowner Bill of Rights is not intended to list every right recognized under Florida law, it does state homeowners generally have the statutory right to choose the contractor that repairs damage to a home with respect to an insurance claim.

27. In this connection, AOBs were frequently used in the property damage industry to make the claims process more efficient for the homeowner and the contractor. Fundamentally, an AOB is a written agreement that permits an insured to voluntarily assign his or her rights and insurance benefits to a third-party contractor.

28. Once signed, the contractor "steps into the shoes" of the policyholder and allows the contractor (i) to discuss the insurance claim with the carrier; (ii) to bill the insurer directly for work performed and materials furnished for the benefit of the

---

[5] *Id*. at 29.

insured; (iii) to be paid directly by the carrier; and (iv) if necessary, commence an action against the insurance company to collect amounts due and owing to the contractor.

29.    AOBs were used for a long time, especially during emergency weather situations. In Florida, AOBs were prevalent in the residential property context when homeowners suffer damage to their home and need to hire contractors to repair the issues.

30.    When damage does occur, immediate remediation is often required to protect against further storms, water leakage, or other types of damage and allows a homeowner to continue to reside on the property while preventing further serious damage to the home.

31.    AOBs are regulated in Florida pursuant to Section 627.7152 of the Florida Statutes, among others. This statute became effective in 2019.

32.    Homeowners typically exercised their AOB rights under their insurance contracts so the contractors making the repairs could handle the claim without the need for a homeowner's constant involvement with the insurance company, an approach that many homeowners found preferable.

33.    Many homeowners lack extensive familiarity or experience with the claims process, which can be daunting and stressful. AOBs also allowed repairs to be made without the homeowner fronting the cost of the remediation and then seeking reimbursement from insurers.

**C.     DFS AND PERRAULT CONDUCTED THE INVESTIGATIONS THAT RESULTED IN THREE FELONY PROSECUTIONS AGAINST SMITH.**

34.     While Smith did assist homeowners with signing AOBs, any assertion that he participated in or was connected and intricately intertwined with an insurance fraud scheme is categorically false.

35.     Upon information and belief, after Perrault learned Smith was successful in his industry and at the behest of certain insurance carriers, he proceeded to harm Smith's freedom and his livelihood. Perrault has a history of engaging in alleged dishonest acts in his professional capacity.

**(i)     *The "Investigation" that Led to the First Criminal Prosecution.***

36.     The first undercover investigation of Smith involved acts that allegedly occurred from November 22-25, 2022. In this connection and on November 22, 2022, Smith was an independent salesman for a licensed roofing contractor. Smith neither held a roofing contractor license nor a public adjuster license. While conducting door to door roofing sales on this day, he met a homeowner named Ajay Maguluru ("Maguluru") at his residence located at 2005 Ryman Place, Tampa, FL 33647 (the "Property"). Maguluru owned the Property and had residential property insurance through Olympus Insurance Company ("Olympus") pursuant to a policy with an effective date from April 17, 2022 – April 17, 2023.

37.     The DFS Affidavit that memorialized the purported "facts" of the investigation are below. ***Significantly, the material facts were ultimately refuted as false during discovery in the subsequent criminal case involving this Property***.

10

38.     The Affidavit stated on November 22, 2022, Maguluru was solicited by Smith on behalf of a roofing contractor. Additionally, the Affidavit also stated the following: (a) Smith inspected the roof and indicated the roof inspection revealed significant damage to the tile roof requiring a complete replacement; (b) Maguluru was assured his insurance company would pay for it; (c) Smith exaggerated existing imperfections to the roof and requested the homeowner's insurance policy information; (d) Smith stated Maguluru's roof would be replaced if Maguluru submitted an insurance claim to Olympus; (e) Smith presented an AOB form for Maguluru to sign; (f) the Olympus claim was initiated by Smith and identified himself as a "contractor"; (g) Smith submitted the claim and indicated the date of loss was November 10, 2022; (h) Maguluru confirmed that Smith determined the date of loss; (i) Olympus partially denied the claim; (j) Smith fabricated the date of loss; (k) Smith told Maguluru the roof could not be "patched" or "fixed" and the entire tile roof needed to be replaced due to discontinued tiles, which Smith knew to be false; (l) Smith acted as a public adjuster; and (m) Smith initiated a fraudulent homeowner's insurance claim for a roof replacement with a fabricated date of loss and damage.

39.     The supposed "facts" in the DFS Affidavit involving the Maguluru Property resulted in the Hillsborough County State Attorney's Office prosecuting Smith for insurance fraud, acting as a public adjuster without a license, and engaging in unlawful acts as a contractor during a state of emergency. A copy of the three count felony information is attached hereto as **Exhibit B**.

11

### a.      The First Criminal Prosecution Regarding the Maguluru Property Was Based on False Facts.

40.      During the discovery process, Maguluru testified he never saw Smith get on his roof to inspect or appraise any damage. In fact, someone other than Smith did this task. Maguluru also stated any information Smith had regarding the roof damage would have been obtained by the individual who inspected the roof and not by Smith.

41.      Maguluru testified that he signed an AOB knowing he assigned the post-loss rights to insurance benefits to the roofing contractor. Maguluru confirmed at no time did Smith represent himself to be a public adjuster or a licensed roofing contractor, and he never tried to impersonate anyone. He also established Smith never said he was a licensed roofing contractor. Smith was simply an independent salesman acting on behalf of a licensed roofing contractor.

42.      Critically, Maguluru gave Smith permission, both verbally and pursuant to the AOB, to call Olympus to report the insurance claim. Ultimately, Olympus informed Maguluru that the insurance claim submitted was a covered loss under the policy. When Olympus approved the claim, the carrier never asserted the insurance claim was fraudulent.

43.      Perrault was the detective that conducted the "investigation" regarding the Maguluru Property and was the author of the Affidavit. Yet, Perrault's colleague, Ricky Trinidad ("Trinidad"), signed the above Affidavit. When Trinidad was deposed in Smith's criminal case concerning the Maguluru Property, Trinidad testified that he did not have anything to do with the investigation, other than identify Smith's voice

on a recorded call, the substance of which Trinidad had no recollection, and he did not know why his signature was included as the Affiant as opposed to Perrault's signature.

44.    Based on the above facts, Smith filed a Motion to Dismiss the Information regarding the Maguluru Property. After the State discovered overwhelming evidence existed that refuted the felony Information, the State filed a Notice of *Nolle Prosequi*, which is attached hereto as **Exhibit C**.

### (ii)    The *"Investigation"* that Led to the Second Criminal Prosecution.

45.    The second undercover investigation of Smith involved acts that allegedly occurred from January 2-4, 2023. In this connection and on January 2, 2023, Smith was an independent salesman for a licensed roofing contractor. Smith neither held a roofing contractor license nor a public adjuster license. While conducting door to door roofing sales on this day, he met a homeowner named Eric Adams ("Adams") at his residence located at 7307 Brightwater Oaks Drive, Tampa, FL 33625 (the "Property"). Adams owned the Property and had residential property insurance through First Protective Insurance Company d/b/a Frontline Insurance ("Frontline") pursuant to a policy with an effective date from June 15, 2022 – June 15, 2023.

46.    The DFS Affidavit that memorialized the purported "facts" of the investigation are below. ***Significantly, the material facts were ultimately refuted as false during discovery in the subsequent criminal case involving this Property***.

47.     The Affidavit stated on January 2, 2023, Adams was solicited by Smith on behalf of a roofing contractor. Additionally, the Affidavit also stated the following: (a) Smith inspected the roof and indicated the roof inspection revealed significant damage to the tile roof[6] requiring a complete replacement; (b) Adams was assured his insurance company would pay for it; (c) Smith exaggerated existing imperfections to the roof and requested the homeowner's insurance policy information; (d) Smith stated Adams' roof would be replaced if Adams submitted an insurance claim to Frontline; (e) Smith presented an AOB form for Adams to sign; (f) the Olympus claim was initiated by Smith without Adams' knowledge, and he provided his telephone number as the contact for the claim; (g) Smith submitted the claim and indicated the date of loss was December 15, 2022; (h) Frontline initially determined the loss was inconsequential, did not occur on the date claimed to be the date of loss, and the few shingles identified as damaged could be individually replaced; (i) Smith fabricated the date of loss; (j) Smith acted as a public adjuster; (k) litigation ensued regarding the claim, which ultimately settled as a covered loss; and (l) Smith initiated a fraudulent homeowner's insurance claim for a roof replacement with a fabricated date of loss and damage.

48.     The supposed "facts" in the DFS Affidavit involving the Adams Property resulted in the Hillsborough County State Attorney's Office prosecuting Smith for insurance fraud, acting as a public adjuster without a license, and engaging in unlawful

---

[6] The roof was a shingle roof and not a tile roof.

acts as a contractor during a state of emergency. A copy of the three count felony information is attached hereto as **Exhibit D**.

### a. The Second Criminal Prosecution Regarding the Adams Property Was Based on False Facts.

49.     During the discovery process, Adams testified he never saw Smith get on his roof to inspect or appraise any damage. In fact, someone other than Smith did this task. Adams also stated any information Smith had regarding the roof damage would have been obtained by the individual who inspected the roof and not by Smith.

50.     Adams also testified that he signed an AOB knowing he assigned the post-loss rights to insurance benefits to the roofing contractor. Adams confirmed at no time did Smith represent himself to be a public adjuster or a licensed roofing contractor, and he never tried to impersonate anyone. He also established Smith never said he was a licensed roofing contractor. Smith was simply an independent salesman acting on behalf of a licensed roofing contractor.

51.     Critically, Adams gave the roofing contractor permission pursuant to the AOB, to initiate an insurance claim with Frontline. There was no evidence of any recorded call reporting the claim, no physical evidence to support Perrault's statement in his Affidavit that Frontline was provided with Smith's telephone number, and no physical evidence to demonstrate Smith reported the Adams claim to Frontline. Moreover, Smith's name and signature never appeared on the roofing contractor's scope of work agreement, and there was no evidence identifying who, how, when, or if the scope of work agreement was ever sent to Frontline. There was no evidence

15

Smith prepared any document that he sent to Frontline regarding a claim for payment or other benefit related to the Adams insurance claim. Ultimately, Frontline settled the claim with Adams' lawyer based on the date of loss submitted. In paying Adams, Frontline did not assert the insurance claim was fraudulent.

52.     Perrault was the detective that conducted the "investigation" regarding the Adams Property and was the author of the Affidavit.

53.     Based on the above facts, Smith filed a Motion to Dismiss the Information regarding the Adams Property. After the State discovered overwhelming evidence existed that refuted the felony Information, the State file a Notice of *Nolle Prosequi*, which is attached hereto as **Exhibit E**.

> **(iii)     The "Investigation" that Led to the Third Criminal Prosecution.**

54.     The third undercover investigation of Smith involved acts that allegedly occurred from May 5-9, 2023. In this connection and on May 5, 2023, Smith was an independent salesman for a licensed roofing contractor. Smith neither held a roofing contractor license nor a public adjuster license. While conducting door to door roofing sales on this day, he met a homeowner named Marjorie Goodson at her residence located at 809 Riviera Dunes Way, Palmetto, FL 34221 (the "Property"). Goodson owned the Property with her husband (collectively, "Goodson") and had residential property insurance through First Protective Insurance Company d/b/a Frontline Insurance ("Frontline").

16

55.    The DFS Affidavit that memorialized the purported "facts" of the investigation are below. ***Significantly, the material facts were ultimately refuted as false during discovery in the subsequent criminal case involving this Property***.

56.    The Affidavit stated on May 5, 2023, Goodson was solicited by Smith on behalf of a roofing contractor. Additionally, the Affidavit also stated the following: (a) Smith inspected the roof and indicated the roof inspection revealed significant damage to the tile roof requiring a complete replacement; (b) Goodson was assured her insurance company would pay for it; (c) Smith exaggerated existing imperfections to the roof and requested the homeowner's insurance policy information; (d) Smith stated Goodson's roof would be replaced if Goodson submitted an insurance claim to Frontline; (e) a letter of protection agreement was presented to Goodson to sign; (f) the letter of protection had the signature of Smith and Goodson on it; (g) Goodson stated the signature was not genuine and never signed the agreement; (h) Goodson never spoke with Smith on the dates the agreement was electronically signed; (i) he did not authorize anyone to provide his signature, assume the identity, or file an insurance claim with Frontline; (j) an insurance claim was initiated with a date of loss of April 27, 2023; (k)  Frontline initially determined the loss was inconsequential and only a few tiles had issues identified; and (l) Smith initiated a fraudulent homeowner's insurance claim for a roof replacement with a fabricated date of loss and damage.

57.    The supposed "facts" in the DFS Affidavit involving the Goodson Property resulted in the Manatee County State Attorney's Office prosecuting Smith for insurance fraud; acting as a public adjuster without a license; fraudulently using

personal identification information of someone that is 60 years or older; uttering a forged instrument; and engaging in unlawful acts as a contractor during a state of emergency. A copy of the five count felony information is attached hereto as **Exhibit F**.

> *a.    The Third Criminal Prosecution Regarding the Goodson Property Was Based on False Facts.*

58.    During the discovery process, it was confirmed that between May 6, 2023 and May 9, 2023, Smith contacted Goodson via telephone and text regarding the Property. In fact, on May 7, 2023, Smith e-mailed Goodson the letter of protection agreement. Goodson testified he signed the agreement electronically and that the signature was in fact his genuine. Indeed, Goodson texted Smith he signed the document.

59.    Critically, Goodson also testified he did not know who sent the letter of protection agreement to Frontline, but he believed it was not Smith. During a recorded call between Perrault and Goodson, Perrault confirmed there was no direct evidence identifying who, how, when, or if the letter of protection agreement was sent to Frontline.

60.    Moreover, Smith's name and signature never appeared on the roofing contractor's scope of work agreement, and there was no evidence identifying who, how, when, or if the scope of work agreement was ever sent to Frontline either. There was also no evidence Smith prepared any document sent to Frontline regarding a claim for payment or other benefit related to the Goodson insurance claim.

61.   Goodson testified at no time did Smith represent himself to be a public adjuster or a licensed roofing contractor, and he never tried to impersonate anyone. He also established Smith never said he was a licensed roofing contractor and he never made any recommendations for Goodson to contact Frontline about coverage for roof damage. Smith was simply an independent salesman acting on behalf of a licensed roofing contractor.

62.   Additionally, Goodson testified that Smith never forged his electronic signature, he did not sign the document for Goodson without Goodson's consent, and Smith never assumed Goodson's identity to submit an insurance claim to Frontline. Rather, by signing the letter of protection agreement, Goodson testified that he gave the roofing contractor the authority to use his personal information in the document. No forgery of any document ever occurred.

63.   Perrault was the detective that conducted the "investigation" regarding the Goodson Property and was the author of the Affidavit.

64.   Based on the above facts, Smith filed a Motion to Dismiss the Information regarding the Goodson Property. After the State discovered overwhelming evidence existed that refuted the felony Information, the State file a Notice of *Nolle Prosequi*, which is attached hereto as **Exhibit G**.

**D.   THE CRIMINAL PROSECUTIONS BASED ON FALSE FACTS WERE HIGHLY PUBLICIZED ON TV AND THE INTERNET.**

65.   Fox News posted an article titled "Palm Harbor man being investigated for soliciting homeowners, negotiating roof damage claims without license." The

article discussed the Hillsborough and Manatee County cases, largely parroting the false allegations.

66. Fox News also reported the story on live television.

67. Other news outlets reported the story.

68. LinkedIn picked up the story.

69. The National Insurance Crime Bureau publicized the article as well.

70. Smith's mugshot was all over the internet too.

71. Florida Tort Reform posted the article.

72. Private insurance agencies reported Smith criminal cases as well.

73. Nationwide Roof Repair also posted the article on its website.

**E. SMITH INCURRED SIGNIFICANT DAMAGES FROM THE CRIMINAL PROSECUTIONS THAT WERE BASED ON PERRAULT'S FANCIFUL, FALSE, AND SHODDY INVESTIGATIONS.**

74. Due to the three criminal prosecutions, Smith incurred significant attorneys' fees to exonerate himself and endured significant emotional and physical distress.

75. Additionally, the false charges and corresponding criminal matters irreparably destroyed Smith's private roofing company that was performing well prior to the filing of the criminal cases. Thus, Smith suffered lost profits and damages stemming from his company's destruction.

76. This case seeks to hold Perrault accountable for his malicious conduct that no other reasonable person under the circumstances would have ever pursued.

## CLAIMS FOR RELIEF

### COUNT I – 42 U.SC. §1983 MALICIOUS PROSECUTION VIOLATION RELATED TO FIRST CRIMINAL PROSECUTION (AGAINST PERRAULT)

77. Smith realleges the allegations contained in Paragraphs 1-33, 34-44, and 65-76 above, as if set forth fully herein.

78. This is an action against Perrault for violation of 42 U.S.C. §1983 ("Section 1983") for malicious prosecution related to the First Criminal Prosecution.

79. The nature of this claim involves a violation of the Fourth Amendment to the United States Constitution and is a valid constitutional tort pursuant to Section 1983.

80. There exists a federal right to be free from malicious prosecution, which is a depiction of the right to be free from an unlawful seizure that is a material part of the prosecution.

81. As part of the commencement of the First Criminal Prosecution, Smith was unlawfully and forcibly restrained in violation of the Fourth Amendment, and his injuries due to the seizure naturally flowed from the commencement and continuation of the criminal proceeding for a significant period of time.

82. Perrault, at all times relevant to the First Criminal Prosecution, was a Law Enforcement Detective with the Florida Department of Financial Services, Bureau of Insurance Fraud, and, upon information and belief, is employed by the State of Florida.

21

83.     Perrault acted towards Smith under the color of the Florida Statutes, ordinances, customs, and usage of the State of Florida, specifically, investigating alleged violations of the Florida Statutes concerning insurance fraud.

84.     With regard to the First Criminal Prosecution, Perrault acted in his capacity as a Law Enforcement Detective with the Florida Department of Financial Services, Bureau of Insurance Fraud, with full permission by the State of Florida to perform his job functions.

85.     Perrault furnished material information, including the DFS Affidavit related to the First Criminal Prosecution to the Office of the State Attorney, which improperly influenced its decision to prosecute the First Criminal Prosecution. As a result, Perrault was the legal cause of the First Criminal Prosecution against Smith, who was the defendant in the underlying criminal action.

86.     The State filed its Notice of *Nolle Prosequi* in the First Criminal Prosecution. The totality of the circumstances set forth above indicated that the First Criminal Prosecution amounted to a dismissal on the merits. Therefore, the dismissal constituted a bone-fide termination of the First Criminal Prosecution in favor of Smith.

87.     The filing and continued prosecution of the First Criminal Prosecution lacked probable cause. Critically, the First Criminal Prosecution had no reasonable prospect of success at its inception and after discovery revealed it was based on false facts.

88.     At all stages of the proceedings, probable cause did not exist to maintain the First Criminal Prosecution because the factual bases for the alleged crimes committed were false and not based on any credible evidence.

89.     Further investigation was necessary before Perrault furnished material information, including the DFS Affidavit related to the First Criminal Prosecution, to the Office of the State Attorney. Perrault caused the Office of the State Attorney to commence a criminal proceeding  based on false facts that could equally be explained innocently.

90.     A reasonable Law Enforcement Detective with the Florida Department of Financial Services, Bureau of Insurance Fraud, would not regard the investigation related to the First Criminal Prosecution as tenable if the true facts were revealed. Alternatively or additionally, Perrault unreasonably neglected to investigate the facts before improperly influencing the decision of the Office of the State Attorney to prosecute the First Criminal Prosecution. Thus, Perrault's actions were not in good faith and for a legally justifiable reason.

91.     As set forth in great detail above, Perrault's conduct was for improper purposes and without substantial justification.

92.     Perrault acted with actual and legal malice.

93.     Smith has been damaged as a direct and proximate result of Perrault's malicious conduct related to the First Criminal Prosecution. Smith had to pay substantial attorneys' fees to defend the meritless First Criminal Prosecution, his

roofing company was financially destroyed, and he also incurred significant emotional and physical distress from the First Criminal Prosecution.

WHEREFORE, Plaintiff, Trevor Smith, respectfully request that this Court enter a judgment against Defendant, Robert J. Perrault, Jr., for the above compensatory and consequential damages, lost earning capacity, punitive damages based on Perrault's evil intent or callous or reckless indifference to federally protected rights, prejudgment interest, costs, attorneys' fees pursuant to 42 U.S.C. §1988(b), and such other and further relief that this Honorable Court may deem just and proper, including, but not limited to, the remedies set forth in Section 284.30 et seq. of the Florida Statutes.

**COUNT II – 42 U.S.C. §1983 MALICIOUS PROSECUTION VIOLATION RELATED TO SECOND CRIMINAL PROSECUTION (AGAINST PERRAULT)**

94. Smith realleges the allegations contained in Paragraphs 1-35, 45-53, and 65-76 above, as if set forth fully herein.

95. This is an action against Perrault for violation of 42 U.S.C. §1983 ("Section 1983") for malicious prosecution related to the Second Criminal Prosecution.

96. The nature of this claim involves a violation of the Fourth Amendment to the United States Constitution and is a valid constitutional tort pursuant to Section 1983.

24

97.    There exists a federal right to be free from malicious prosecution, which is a depiction of the right to be free from an unlawful seizure that is a material part of the prosecution.

98.    As part of the commencement of the Second Criminal Prosecution, Smith was unlawfully and forcibly restrained in violation of the Fourth Amendment, and his injuries due to the seizure naturally flowed from the criminal proceeding commenced and was continued for a significant period of time.

99.    Perrault, at all times relevant to the Second Criminal Prosecution, was a Law Enforcement Detective with the Florida Department of Financial Services, Bureau of Insurance Fraud, and, upon information and belief, is employed by the State of Florida.

100.    Perrault acted towards Smith under the color of the Florida Statutes, ordinances, customs, and usage of the State of Florida, specifically, investigating alleged violations of the Florida Statutes concerning insurance fraud.

101.    With regard to the Second Criminal Prosecution, Perrault acted in his capacity as a Law Enforcement Detective with the Florida Department of Financial Services, Bureau of Insurance Fraud, with full permission by the State of Florida to perform his job functions.

102.    Perrault furnished material information, including the DFS Affidavit related to the Second Criminal Prosecution to the Office of the State Attorney, which improperly influenced the decision to prosecute the Second Criminal Prosecution. As

a result, Perrault was the legal cause of the Second Criminal Prosecution against Smith, who was the defendant in the underlying criminal action.

103. The State file its Notice of *Nolle Prosequi* in the Second Criminal Prosecution. The totality of the circumstances set forth above indicated that the Second Criminal Prosecution amounted to a dismissal on the merits. Therefore, the dismissal constituted a bone-fide termination of the Second Criminal Prosecution in favor of Smith.

104. The filing and continued prosecution of the Second Criminal Prosecution lacked probable cause. Critically, the Second Criminal Prosecution had no reasonable prospect of success at its inception and after discovery revealed it was based on false facts.

105. At all stages of the proceedings, probable cause did not exist to maintain the Second Criminal Prosecution because the factual bases for the alleged crimes committed were false and not based on any credible evidence.

106. Further investigation was necessary before Perrault furnished material information, including the DFS Affidavit related to the Second Criminal Prosecution, to the Office of the State Attorney. Perrault caused the Office of the State Attorney to commence and continue a criminal proceeding  based on false facts that could equally be explained innocently.

107. A reasonable Law Enforcement Detective with the Florida Department of Financial Services, Bureau of Insurance Fraud, would not regard the investigation related to the Second Criminal Prosecution as tenable if the true facts were revealed.

Alternatively or additionally, Perrault unreasonably neglected to investigate the facts before improperly influencing the decision of the Office of the State Attorney to prosecute the Second Criminal Prosecution. Thus, Perrault's actions were not in good faith and for a legally justifiable reason.

108. As set forth in great detail above, Perrault's conduct was for improper purposes and without substantial justification.

109. Perrault acted with actual and legal malice.

110. Smith has been damaged as a direct and proximate result of Perrault's malicious conduct related to the Second Criminal Prosecution. Smith had to pay substantial attorneys' fees to defend the meritless Second Criminal Prosecution, his roofing company was financially destroyed, and he also incurred significant emotional and physical distress from the Second Criminal Prosecution.

WHEREFORE, Plaintiff, Trevor Smith, respectfully request that this Court enter a judgment against Defendant, Robert J. Perrault, Jr., for the above compensatory and consequential damages, lost earning capacity, punitive damages based on Perrault's evil intent or callous or reckless indifference to federally protected rights, prejudgment interest, costs, attorneys' fees pursuant to 42 U.S.C. §1988(b), and such other and further relief that this Honorable Court may deem just and proper, including, but not limited to, the remedies set forth in Section 284.30 et seq. of the Florida Statutes.

**COUNT III – 42 U.S.C. §1983 MALICIOUS PROSECUTION VIOLATION
RELATED TO THIRD CRIMINAL PROSECUTION
(AGAINST PERRAULT)**

111.    Smith realleges the allegations contained in Paragraphs 1-35 and 54-76 above, as if set forth fully herein.

112.    This is an action against Perrault for violation of 42 U.S.C. §1983 ("Section 1983") for malicious prosecution related to the Third Criminal Prosecution.

113.    The nature of this claim involves a violation of the Fourth Amendment to the United States Constitution and is a valid constitutional tort pursuant to Section 1983.

114.    There exists a federal right to be free from malicious prosecution, which is a depiction of the right to be free from an unlawful seizure that is a material part of the prosecution.

115.    As part of the commencement of the Third Criminal Prosecution, Smith was unlawfully and forcibly restrained in violation of the Fourth Amendment, and his injuries due to the seizure naturally flowed from the criminal proceeding commenced and was continued for a significant period of time.

116.    Perrault, at all times relevant to the Third Criminal Prosecution, was a Law Enforcement Detective with the Florida Department of Financial Services, Bureau of Insurance Fraud, and, upon information and belief, is employed by the State of Florida.

28

117. Perrault acted towards Smith under the color of the Florida Statutes, ordinances, customs, and usage of the State of Florida, specifically, investigating alleged violations of the Florida Statutes concerning insurance fraud.

118. With regard to the Third Criminal Prosecution, Perrault acted in his capacity as a Law Enforcement Detective with the Florida Department of Financial Services, Bureau of Insurance Fraud, with full permission by the State of Florida to perform his job functions.

119. Perrault furnished material information, including the DFS Affidavit related to the Third Criminal Prosecution to the Office of the State Attorney, which improperly influenced its decision to prosecute the Third Criminal Prosecution. As a result, Perrault was the legal cause of the Third Criminal Prosecution against Smith, who was the defendant in the underlying criminal action.

120. The State file its Notice of *Nolle Prosequi* in the Third Criminal Prosecution. The totality of the circumstances set forth above indicated that the Third Criminal Prosecution amounted to a dismissal on the merits. Therefore, the dismissal constituted a bone-fide termination of the Third Criminal Prosecution in favor of Smith.

121. The filing and continued prosecution of the Third Criminal Prosecution lacked probable cause. Critically, the Third Criminal Prosecution had no reasonable prospect of success at its inception and after discovery revealed it was based on false facts.

122.   At all stages of the proceedings, probable cause did not exist to maintain the Third Criminal Prosecution because the factual bases for the alleged crimes committed were false and not based on any credible evidence.

123.   Further investigation was necessary before Perrault furnished material information, including the DFS Affidavit related to the Third Criminal Prosecution, to the Office of the State Attorney. Perrault caused the Office of the State Attorney to commence a criminal proceeding based on false facts that could equally be explained innocently.

124.   A reasonable Law Enforcement Detective with the Florida Department of Financial Services, Bureau of Insurance Fraud, would not regard the investigation related to the Third Criminal Prosecution as tenable if the true facts were revealed. Alternatively or additionally, Perrault unreasonably neglected to investigate the facts before improperly influencing the decision of the Office of the State Attorney to prosecute the Third Criminal Prosecution. Thus, Perrault's actions were not in good faith and for a legally justifiable reason.

125.   As set forth in great detail above, Perrault's conduct was for improper purposes and without substantial justification.

126.   Perrault acted with actual and legal malice.

127.   Smith has been damaged as a direct and proximate result of Perrault's malicious conduct related to the Third Criminal Prosecution. Smith had to pay to pay substantial attorneys' fees to defend the meritless Third Criminal Prosecution, his

30

roofing company was financially destroyed, and he also incurred significant emotional and physical distress from the Third Criminal Prosecution.

WHEREFORE, Plaintiff, Trevor Smith, respectfully request that this Court enter a judgment against Defendant, Robert J. Perrault, Jr., for the above compensatory and consequential damages, lost earning capacity, punitive damages based on Perrault's evil intent or callous or reckless indifference to federally protected rights, prejudgment interest, costs, attorneys' fees pursuant to 42 U.S.C. §1988(b), and such other and further relief that this Honorable Court may deem just and proper, including, but not limited to, the remedies set forth in Section 284.30 et seq. of the Florida Statutes.

## COUNT IV – NEGLIGENT INVESTIGATION RELATED TO FIRST CRIMINAL PROSECUTION
## (AGAINST DFS)

128.   Smith realleges the allegations contained in Paragraphs 1-33, 34-44, and 65-76 above, as if set forth fully herein.

129.   As a Law Enforcement Agency within the State of Florida, DFS owed a duty to Smith, as with all citizens of Florida, to perform an investigation with diligence to ensure that the investigation is conducted properly with cognizable and truthful facts.

130.   DFS had a duty to properly evaluate the veracity of the facts in connection with the First Criminal Prosecution, including the information Perrault gathered on their behalf, such as the DFS Affidavit related to the First Criminal Prosecution that Perrault provided to the Office of the State Attorney. DFS's failure

31

to do so ultimately resulted in the Office of the State Attorney's decision to prosecute the First Criminal Prosecution.

131.    The filing and continued prosecution of the First Criminal Prosecution lacked probable cause. Critically, the First Criminal Prosecution had no reasonable prospect of success at its inception and, after discovery, it was revealed that it was based on false facts.

132.    A Law Enforcement Agency like the Florida Department of Financial Services, Bureau of Insurance Fraud, would not regard the investigation related to the First Criminal Prosecution as tenable if they had conducted a reasonable investigation to unearth the true facts which were later revealed in discovery during the First Criminal Prosecution.

133.    At all stages of the proceedings, probable cause did not exist to maintain the First Criminal Prosecution because the factual bases for the alleged crimes committed were false and not based on any credible evidence. Therefore, the State filed its Notice of *Nolle Prosequi* in the First Criminal Prosecution.

134.    DFS breached its duty owed to Smith by failing to conduct a diligent and proper investigation into the veracity of the facts related to the First Criminal Prosecution, including the information provided by Perrault, to ensure probable cause existed prior to referring Smith for prosecution.

135.    Smith has been damaged as a direct and proximate result of DFS's negligent investigation related to the First Criminal Prosecution. Smith had to pay substantial attorneys' fees to defend the meritless First Criminal Prosecution, his

roofing company was financially destroyed, and he also incurred significant emotional and physical distress from the First Criminal Prosecution.

WHEREFORE, Plaintiff, Trevor Smith, respectfully requests that this Court enter a judgment against Defendant, The Florida Department of Financial Services, for the above compensatory and consequential damages, lost earning capacity, costs, and such other and further relief that this Honorable Court may deem just and proper.

## COUNT V - NEGLIGENT INVESTIGATION RELATED TO SECOND CRIMINAL PROSECUTION (AGAINST DFS)

136. Smith realleges the allegations contained in Paragraphs 1-35, 45-53, and 65-76 above, as if set forth fully herein.

137. As a Law Enforcement Agency within the State of Florida, DFS owed a duty to Smith, as with all citizens of Florida, to perform an investigation with diligence to ensure that the investigation is conducted properly with cognizable and truthful facts.

138. DFS had a duty to properly evaluate the veracity of the facts in connection with the Second Criminal Prosecution, including the information Perrault provided on their behalf, such as the DFS Affidavit related to the Second Criminal Prosecution that Perrault provided to the Office of the State Attorney. DFS's failure to do so ultimately resulted in the Office of the State Attorney's decision to prosecute the Second Criminal Prosecution.

139. The filing and continued prosecution of the Second Criminal Prosecution lacked probable cause. Critically, the Second Criminal Prosecution had no reasonable

33

prospect of success at its inception and, after discovery, it was revealed that it was based on false facts.

140.   A Law Enforcement Agency like the Florida Department of Financial Services, Bureau of Insurance Fraud, would not regard the investigation related to the Second Criminal Prosecution as tenable if they had conducted a reasonable investigation to unearth the true facts which were later revealed in discovery during the Second Criminal Prosecution.

141.   At all stages of the proceedings, probable cause did not exist to maintain the Second Criminal Prosecution because the factual bases for the alleged crimes committed were false and not based on any credible evidence. Therefore, the State filed its Notice of *Nolle Prosequi* in the Second Criminal Prosecution.

142.   DFS breached its duty owed to Smith by failing to conduct a diligent and proper investigation into the veracity of the facts related to the Second Criminal Prosecution, including the information provided by Perrault on their behalf, to ensure probable cause existed prior to referring Smith for prosecution.

143.   Smith has been damaged as a direct and proximate result of DFS's negligent investigation related to the Second Criminal Prosecution. Smith had to pay substantial attorneys' fees to defend the meritless Second Criminal Prosecution, his roofing company was financially destroyed, and he also incurred significant emotional and physical distress from the Second Criminal Prosecution.

WHEREFORE, Plaintiff, Trevor Smith, respectfully requests that this Court enter a judgment against Defendant, The Florida Department of Financial Services,

for the above compensatory and consequential damages, lost earning capacity, costs, and such other and further relief that this Honorable Court may deem just and proper.

## COUNT VI – NEGLIGENT INVESTIGATION RELATED TO THIRD CRIMINAL PROSECUTION (AGAINST DFS)

144.    Smith realleges the allegations contained in Paragraphs 1-35 and 54-76 above, as if set forth fully herein.

145.    As a Law Enforcement Agency within the State of Florida, DFS owed a duty to Smith, as with all citizens of Florida, to perform an investigation with diligence to ensure that the investigation is conducted properly with cognizable facts.

146.    DFS had a duty to properly evaluate the veracity of the facts in connection with the Third Criminal Prosecution, including the information Perrault provided on their behalf, such as the DFS Affidavit related to the Third Criminal Prosecution that Perrault provided to the Office of the State Attorney. DFS's failure to do so ultimately resulted in the Office of the State Attorney's decision to prosecute the Third Criminal Prosecution.

147.    The filing and continued prosecution of the Third Criminal Prosecution lacked probable cause. Critically, the Third Criminal Prosecution had no reasonable prospect of success at its inception and, after discovery, it was revealed that it was based on false facts.

148.    A Law Enforcement Agency like the Florida Department of Financial Services, Bureau of Insurance Fraud, would not regard the investigation related to the Third Criminal Prosecution as tenable if they had conducted a reasonable

35

investigation to unearth the true facts which were later revealed in discovery during the Third Criminal Prosecution.

149.    At all stages of the proceedings, probable cause did not exist to maintain the Third Criminal Prosecution because the factual bases for the alleged crimes committed were false and not based on any credible evidence. Therefore, the State filed its Notice of *Nolle Prosequi* in the Third Criminal Prosecution.

150.    DFS breached its duty owed to Smith by failing to conduct a diligent and proper investigation into the veracity of the facts related to the Third Criminal Prosecution, including the information provided by Perrault on DFS's behalf, to ensure probable cause existed prior to referring Smith for prosecution.

151.    Smith has been damaged as a direct and proximate result of DFS's negligent investigation related to the Third Criminal Prosecution. Smith had to pay substantial attorneys' fees to defend the meritless Third Criminal Prosecution, his roofing company was financially destroyed, and he also incurred significant emotional and physical distress from the Third Criminal Prosecution.

WHEREFORE, Plaintiff, Trevor Smith, respectfully requests that this Court enter a judgment against Defendant, The Florida Department of Financial Services, for the above compensatory and consequential damages, lost earning capacity, costs, and such other and further relief that this Honorable Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Smith demands a trial by jury on all claims so triable, including pursuant to the Seventh Amendment of the United States Constitution.

36

Dated: December 31, 2025

          **SHAPIRO, BLASI, WASSERMAN**
          **& HERMANN, P.A.**
          *Attorneys for Plaintiff*
          7777 Glades Road, Suite 400
          Boca Raton, FL  33434
          Telephone:   (561) 477-7800
          Facsimile:    (561) 477-7722

          By:      */s/Joshua B. Alper*
                Joshua B. Alper, Esq.
                Florida Bar No. 59875
                Primary E-Mail: jalper@sbwh.law
                Secondary E-Mail: crestivo@sbwh.law
                              floridaservice@sbwh.law

37